[No. G039733. Fourth Dist., Div. Three. Jan. 6, 2009.]

JULIE ANN WILSON, Plaintiff and Appellant, v.
COUNTY OF ORANGE, Defendant and Respondent.

**COUNSEL**

Shuff Law Firm and John J. Gulino for Plaintiff and Appellant.

Lewis Brisbois Bisgaard & Smith, Nancy E. Zeltzer and Gary M. Lape for Defendant and Respondent.

**OPINION**

**O'LEARY, Acting P. J.**—Julie Ann Wilson appeals from a judgment in favor of her employer the County of Orange (the County). Wilson is a radio dispatcher at the Orange County Sheriff's Department's (the Department)

countywide emergency communications system. She sued the County under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12940, subds. (m), (n)),[1] contending it failed to make reasonable accommodation for her medical condition that necessitated she avoid the most stressful aspects of her job. Specifically, Wilson had sought to be excused from staffing the pursuit desk, the communication channel that assists officers who leave their jurisdictions during a pursuit or emergency. Although the County accommodated Wilson in precisely the manner she sought, she contends it nonetheless violated FEHA by not providing her the accommodation earlier and by not initiating an "interactive process" sooner to determine whether she could be accommodated.

A jury returned a verdict in the County's favor. On appeal, Wilson contends the defense verdict is not supported by substantial evidence. We disagree and affirm the judgment.

## STANDARD OF REVIEW

Because the sole issue on appeal is whether substantial evidence supports the jury's verdict in favor of the County, we find it useful to preface our recitation of the facts with a statement of the standard of review.

When a party contends insufficient evidence supports a jury verdict, we apply the substantial evidence standard of review. (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053 [68 Cal.Rptr.2d 758, 946 P.2d 427], superseded by statute on another ground as noted in *DeBerard Properties, Ltd. v. Lim* (1999) 20 Cal.4th 659, 668 [85 Cal.Rptr.2d 292, 976 P.2d 843].) " '[T]he power of [the] appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the [verdict].' [Citations.]" (*Gray v. Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 503 [198 Cal.Rptr. 551, 674 P.2d 253].) We must "view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor . . . ." (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660 [190 Cal.Rptr. 355, 660 P.2d 813].) Needless to say, a party "raising a claim of insufficiency of the evidence assumes a 'daunting burden' " (*Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 678 [11 Cal.Rptr.3d 807]), one that simply has not been met in this case.

---

[1] All further statutory references are to the Government Code, unless otherwise indicated.

## FACTS

Control One is a countywide coordinated emergency communications system, which responds to all agencies, police departments, and public safety agencies in the County. It is the "mutual aid go-to facility for the County as a whole."

Inside the facility are five communication subconsoles (desks) running five communications channels—two "Purple Channels," one "Red Channel," one "Paramedic Desk," and one "Teletype Desk." The Paramedic Desk coordinates medical care for ambulances and medics. The two Purple Channels (subconsoles one and two) retrieve data for officers in the field. When an operator at one of the Purple Channels gets an officer request for information, he or she relates that request to the operator of the Teletype Desk, who obtains the information and gives it back to the Purple Channel operator. The Red Channel (subconsole three), also called the Pursuit Desk, assists officers when they leave their jurisdictions. It also carries countywide broadcasts for missing persons, stolen vehicles, and robberies, and monitors various radio channels (traffic, public works, etc.) to relay information to officers throughout the County.

On each work shift there is a dispatcher at each subconsole (five total) and one supervisor. The typical shift is eight hours, but there are also 10-hour shifts (originally instituted to accommodate employees who want to work only four days a week). Department employees known as communications coordinator II's (CCII's) operate each of the Control One channels and provide backup to the other channels. The Red Channel is backed up first by the shift supervisor, next by one of the Purple Channel operators, and after that, if necessary, by one of the other operators. Each CCII is trained on and rotates staffing at all five channels so every CCII can maintain the skills needed to provide effective backup on any channel.

The Red Channel is generally the most stressful of the channels to operate. Historically, if a CCII was unable to effectively handle the Red Channel, he or she would be moved out of Control One and relocated to another job in the department. Each CCII usually staffed the Red Channel one time a week. However, the department also extensively utilized extra help employees, many of whom were only communications coordinator I's (CCI's). Some of those CCI's operated the Red Channel and some did not.

Wilson began working for the Department in 2001. After she was trained on all channels at Control One, she was promoted to CCII. Wilson suffers

from a rare blood disease called antiphospholidipid antibody syndrome. Also called "thick blood," the disease is an autoimmune disorder that causes the blood to coagulate, causing thrombosis and blood clots. In 2002, Wilson was hospitalized for the condition and out on an extended medical leave. She returned to work and throughout 2003 continued to work on all channels, including the Red Channel once a week, and worked all shifts including the graveyard shift. But in September 2003, Wilson told supervisors she did not like working on the Red Channel because she felt she made errors and was criticized for them.

In August 2004, Wilson mishandled a few incidents while operating the Red Channel. Her supervisor told her she would be scheduled for more days on the Red Channel so she could improve her skills. A week later, Wilson told her supervisor she could not work at the Red Channel for medical reasons. Wilson was having concentration and memory problems that she believed were due to a new medication she was taking for her condition. On August 26, 2004, Wilson went to see an Orange County Health Services nurse and told her she needed the work restriction only until her medication stabilized. Wilson also told the Department's human resources manager, Karen Kiddy, she felt her condition would improve with further treatment and the work restriction would only be temporary.

Dr. Phyllis Klein was a hematologist/internist who treated Wilson since 2002. Because Wilson's medical condition already carried increased risk of heart disease and heart attacks, Dr. Klein believed Wilson should avoid high stress tasks. Wilson told Dr. Klein about the high stress associated with working the Red Channel and working late night shifts. On September 2, 2004, Dr. Klein wrote a letter stating: "[Wilson] cannot work the pursuit desk." The letter did not place limits on the specific shifts Wilson could work.

Wilson's supervisors agreed to a temporary work restriction, with no reduction in pay, and from September 2 until November 30, 2004, she worked only at the Teletype Desk. Wilson was told by supervisors they could not permanently accommodate her work restrictions at Control One due to operational concerns. The Control One command supervisor, Captain Catherine Zurn, agreed to extend Wilson's work restriction until February 2005, which was when Wilson was to have her next medical appointment.

In December 2004, the County's human resources personnel began looking for other positions for Wilson. From December 1 until March 2005, Wilson

was out on unpaid leave. She was offered various positions throughout the County, each of which she rejected because they either involved a longer commute or a demotion and less money. In March, Captain Zurn agreed that Wilson could return to Control One, working only the Teletype Desk, until mid-June.

Wilson returned to work for a few weeks in March, but went out on leave again because her work shifts were alternating. In April 2005, Dr. Klein imposed additional work restrictions—no more than 10 hours per shift and no graveyard shifts.

Captain Zurn and other Control One supervisors were concerned about the impact of permanently accommodating Wilson's work restrictions on Control One operations. If Wilson's shifts were limited, other employees would have to work more graveyard shifts. If her Red Channel shifts were eliminated, other employees would not only have to work at the Red Channel more, but Wilson would not maintain her Red Channel skills so as to be able to provide necessary backup in emergency situations.

Beginning in the fall of 2004, Kiddy had been involved in attempting to accommodate Wilson. She had helped arrange the original temporary accommodation through November 2004, and its extension to the end of February 2005. Around the beginning of 2005, Kiddy began to focus on the possibility that Wilson's need for an accommodation would be permanent. She had several meetings and discussions with Wilson, trying to assist her in finding a different position. Although Kiddy understood the Department's operational concerns, after investigating she came to the conclusion that working regular shifts on the Red Channel, and working occasional graveyard shifts, were probably not essential job functions for a CCII. She also concluded accommodating Wilson by allowing her to not operate the Red Channel would not cause the Department undue hardship.

Kiddy held several meetings with Wilson, Wilson's attorney, and Control One supervisors. In June 2005, she notified Captain Zurn that she was commencing the Department's "interactive process" to determine an accommodation for Wilson. By the end of August, Kiddy had worked out an accommodation agreement that was signed by Wilson and Captain Zurn on August 29, 2005. The agreement provided Wilson would not work more than five consecutive days, no more than 10 hours a day, no graveyard shifts, no alternating shifts, and she would not have to work at the Red Channel. With those restrictions, Wilson would otherwise perform all the CCII duties, including backing up the Red Channel as required. It was also agreed that

when Wilson returned to work, she would go through a two-week orientation period.

Wilson returned to work on September 2, 2005. Two weeks later, she filed her FEHA claim against the County alleging it had failed to reasonably accommodate her disability and had failed to engage in an interactive process. As of trial in August 2007, Wilson was still working at Control One under the restrictions agreed to in August 2005.

*Procedural Facts*

Wilson's complaint alleged three causes of action against the County and one of her supervisors for violation of the FEHA due to (1) failure to accommodate and engage in a good faith interactive process; (2) harassment; and (3) retaliation. The jury was not instructed on harassment or retaliation. It was instructed on Wilson's failure to accommodate cause of action, and in the context of those instructions was told an employer who knows an employee is disabled "must engage in a timely, good faith, interactive process with that employee aimed at affecting reasonable accommodations to permit the employee to continue work, if possible." On the verdict form, the jury was asked to answer a single question: "Has [Wilson] proved by a preponderance of the evidence that she requested [the County] to accommodate a disability which the County then failed or refused to do?" The jury answered in the negative and judgment was entered for the County.

## DISCUSSION

Wilson contends there is no substantial evidence to support a judgment in favor of the County on her failure to accommodate cause of action. We disagree.

█ Under section 12940, it is an unlawful employment practice "to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee" unless the employer demonstrates doing so would impose an undue hardship. (§ 12940, subd. (m).) The essential elements of a failure to accommodate claim are: (1) the plaintiff has a disability covered by the FEHA; (2) the plaintiff is a qualified individual (i.e., he or she can perform the essential functions of the position); and (3) the employer failed to reasonably accommodate the plaintiff's disability. (*Jensen v. Wells Fargo Bank* (2000) 85 Cal.App.4th 245, 256 [102 Cal.Rptr.2d 55] (*Jensen*).)

The FEHA imposes an additional duty on the employer "to engage in a timely, good faith, interactive process with the employee . . . to determine effective reasonable accommodations . . . ." (§ 12940, subd. (n).) An employer's failure to engage in this process is a separate FEHA violation. (*Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 424–425 [69 Cal.Rptr.3d 1].)

In this case, Wilson did not plead a separate cause of action for failure to engage in the interactive process. And although the jury was given an instruction explaining the duty to engage in the interactive process, the verdict form did not ask the jury to make a separate finding on whether or not the employer failed to engage in the process. "Where no special findings are made, the reviewing court may infer that 'the jury by its general verdict found for respondent on every issue submitted.' [Citation.] Specifically, the jury's general verdict 'imports findings in favor of the prevailing party on all material issues; and if the evidence supports implied findings on any set of issues which will sustain the verdict, it will be assumed that the jury so found. The court on appeal does not have to speculate on what particular ground the jury may have found in favor of the prevailing party.' [Citations.]" (*Everett v. Everett* (1984) 150 Cal.App.3d 1053, 1063–1064 [198 Cal.Rptr. 391, 201 Cal.Rptr. 351].) Accordingly, we infer the jury found in the County's favor on the interactive process issue.

It is undisputed Wilson suffered a physical disability covered by the FEHA. Accordingly, we turn to whether substantial evidence supports the conclusion the County did not fail to provide Wilson a reasonable accommodation for her disability or to engage in an interactive process. It does. The questions are generally ones of fact. (*Raine v. City of Burbank* (2006) 135 Cal.App.4th 1215, 1227, fn. 11 [37 Cal.Rptr.3d 899].) There is abundant evidence supporting a finding the County provided Wilson a reasonable accommodation and engaged in a good faith interactive process to arrive at that accommodation.

■ The FEHA provides a nonexhaustive list of possible reasonable accommodations, including as relevant here: job restructuring, offering part-time or modified work schedules, reassigning to a vacant position, adjusting or modifying examinations, training materials or policies, providing qualified readers or interpreters and "other similar accommodations for individuals with disabilities." (§ 12926, subd. (n)(2); see Cal. Code Regs., tit. 2, § 7293.9, subd. (a).) We may also look to similar federal statutes for guidance. (*Spitzer v. Good Guys, Inc.* (2000) 80 Cal.App.4th 1376, 1384 [96 Cal.Rptr.2d 236].) "[A] reasonable accommodation can include providing the employee accrued paid leave or additional unpaid leave for treatment . . ." provided it is likely

that, at the end of such leave, the employee will be able to perform his or her employment duties. (*Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 226 [87 Cal.Rptr.2d 487] (*Hanson*); see *Le Bourgeois v. Fireplace Manufacturers, Inc.* (1998) 68 Cal.App.4th 1049, 1058–1059 [80 Cal.Rptr.2d 660].)

In addition, an employer is not required to choose the best accommodation or the specific accommodation the employee seeks. Instead, " ' "the employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide." [Citation.] . . . [A]n employee cannot make his employer provide a specific accommodation if another reasonable accommodation is instead provided. [Citation.]' [Citation.]" (*Hanson, supra*, 74 Cal.App.4th at p. 228.)

Here, Wilson requested a job accommodation due to her serious medical condition. In September 2004, her doctor wrote a letter directing that Wilson should not work at the Red Channel because of the stress associated with that particular desk. There was evidence Wilson advised her supervisors the accommodation was only needed temporarily—while her medications stabilized. Wilson's supervisors agreed to a temporary work restriction, with no reduction in pay, and from September 2 until November 30, 2004, she worked only at the Teletype Desk.

Wilson was told by supervisors they could not accommodate her work restrictions at Control One permanently. There was significant evidence as to why supervisors considered the ability to effectively handle all five Control One dispatch desks was an operational requirement and thus essential job function for a CCII. Additionally, there was evidence supervisors considered routine assignment to the Red Channel critical to maintaining an operator's skills on that desk.

Nonetheless, Captain Zurn agreed to extend Wilson's temporary restriction to the end of February 2005. In the meantime, while Wilson was out on leave, Captain Zurn, Kiddy, and other County employees were endeavoring to find a different position for Wilson within the Department that would involve less stress for her, but Wilson rejected the various opportunities that were offered. In March 2005, Captain Zurn agreed Wilson could return to Control One, at her same rate of pay, and work only at the Teletype Desk until mid-June. Wilson returned to work for three weeks, but went back out on leave because the shifts she was assigned were unacceptable to her. After that, Wilson's doctor wrote a letter restricting Wilson from working graveyard shifts.

Thereafter, Kiddy negotiated an agreement between Wilson and Captain Zurn that in the end gave Wilson everything she wanted. She was allowed to return to work at Control One in September 2005, with the understanding she would not work more than five consecutive days, no more than 10 hours a day, no graveyard shifts, no alternating shifts, and most importantly, she would not have to work at the Red Channel, other than to provide backup when necessary.

The real gist of Wilson's complaint is not that she was not accommodated, but that it took too long for her supervisors to finally agree to a permanent arrangement—i.e., that she could return to work at Control One, in her same position, with the restrictions she wanted. It is this delay that forms the basis of her interactive process claim. She argues that as a matter of law, the County failed to engage in a good faith interactive process with her because it did not commence the interactive process until June 2005, prior to which the County simply "contrived a circumstance" to justify not engaging in the interactive process—namely, that Wilson's disability was only temporary.

■ Wilson relies on Kiddy's testimony that in June 2005, she notified Captain Zurn she was commencing the "interactive process" to determine an accommodation for Wilson. Following this notification, Kiddy held several meetings that resulted in the August 2005 agreement. But Kiddy's reference to whatever formal negotiating proceedings she commenced as the "interactive process" does not preclude the jury from finding the County, through Kiddy, Captain Zurn, and other County employees were nonetheless engaged in an interactive process all along. The "interactive process" required by the FEHA is an informal process with the employee or the employee's representative, to attempt to identify a reasonable accommodation that will enable the employee to perform the job effectively. (*Jensen, supra,* 85 Cal.App.4th at p. 261.) Ritualized discussions are not necessarily required. (*Hanson, supra,* 74 Cal.App.4th at p. 228.)

Here, the record demonstrates the County engaged in a process aimed at trying to accommodate Wilson. Indeed, the success of its process is borne out by the fact that in the end, Wilson got exactly what she wanted—albeit after a series of temporary accommodations. (See *Hanson, supra,* 74 Cal.App.4th at p. 229 [employer cannot be held liable for failing to engage in interactive process when the employee was in fact offered a reasonable accommodation]; see also *Watkins v. Ameripride Services* (9th Cir. 2004) 375 F.3d 821, 829, fn. 5 [fact that employer reasonably accommodated plaintiff's disability precluded claim it failed to engage in interactive process].) The record amply supports the jury verdict in the County's favor.

## DISPOSITION

The judgment is affirmed. Respondent is awarded its costs on appeal.

Aronson, J., and Fybel, J., concurred.